IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. <u>1:20-cv-2533</u>

4455 JASON ST, LLC,

    and

THE DENVER BEER COMPANY, LLC,

    Plaintiffs,

v.

MCKESSON CORPORATION,

    Defendant.

**COMPLAINT FOR DECLARATORY JUDGMENT AND COST RECOVERY**

Plaintiffs, 4455 Jason St, LLC ("Jason Street") and The Denver Beer Company, LLC ("DBC"), by and through their attorneys, Gablehouse Granberg, LLC, state the following as their Complaint against McKesson Corporation ("McKesson"):

**INTRODUCTION**

1. This action is brought to recover response costs pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq. ("CERCLA") and Colorado law.

2. This matter arises from the discovery of the release and threatened release of hazardous substances into the environment at the property currently known as 4455 Jason Street in Denver, Colorado (the "Site").

3. The release and threatened release of hazardous substances are attributable to the past operations of a chemical distribution and repackaging facility (the "Chemical Distribution Facility") on portions of the Site.

4. Plaintiffs have incurred and will continue to incur response costs in relation to investigating, assessing, evaluating, mitigating, removing, and remediating the environmental contamination attributable to the Chemical Distribution Facility.

5. McKesson is the legal successor to the companies that owned and operated the Chemical Distribution Facility.  As such, McKesson is responsible for the response costs incurred in relation to the former Chemical Distribution Facility's operations.

6. Plaintiffs bring this action against McKesson pursuant to CERCLA and Colorado law to: (1) recover the response costs and damages they have incurred and will incur in relation to the environmental contamination at the Site; and (2) obtain a declaratory judgment that McKesson is responsible for reimbursement of past and future response costs incurred by Plaintiffs at the Site.

## PARTIES

7. Plaintiff, Jason Street, is a Colorado limited liability company with its principal place of business in Denver, Colorado.

8. Plaintiff, DBC, is a Colorado limited liability company with its principal place of business in Denver, Colorado.

9. Upon information and belief, McKesson is a Delaware corporation with its principal place of business in Irving, Texas.

10. Upon information and belief, McKesson is the legal successor to Merchants Chemical Company, McKesson & Robbins, Inc., Foremost-McKesson and McKesson Chemical Company.

## JURISDICTION AND VENUE

11. This action arises under Sections 107(a) and 113(f)(1) of CERCLA, 42 U.S.C. §§ 9607(a), 9613(f)(1), and Colorado law.

12. This Court has original jurisdiction over the CERCLA claims pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 9613(b).

13. Venue is proper in this District under 28 U.S.C. § 1391(b) because the property that is the subject of this action is located within the District. Venue is proper in this District pursuant to 42 U.S.C. § 9613(b) because the release or releases of hazardous substances and related damages giving rise to this action occurred in this Judicial District.

14. Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over the state law claim for trespass because this claim arises out of the same subject matter as, and is related to, the federal CERCLA claims.

## GENERAL ALLEGATIONS

15. Jason Street is the current owner of the Site.

16. In or about September 2016, Jason Street purchased the Site via an assignment of a purchase and sale contract from DBC, the then tenant of the Site.

17. DBC remains a tenant at the Site.

18. Upon information and belief, the Chemical Distribution Facility was operated on portions of the Site from approximately 1947 to 1972.

19. As the successor in interest to the entities that owned and operated the Chemical Distribution Facility, McKesson is liable for the response costs incurred by Plaintiffs in relation to the release of hazardous substances that occurred on the Site during its operation as the Chemical Distribution Facility.

20. In or about November 1947, Merchants Chemical Company ("Merchants") acquired a portion of the Site, which was then known as 1211 44th Avenue, Denver, Colorado.

21. Upon information and belief, Merchants established the Chemical Distribution Facility shortly after the property acquisition.

22. In or about 1958, McKesson & Robbins, Inc. acquired Merchants. Through this acquisition, McKesson & Robbins, Inc. acquired the Site and Chemical Distribution Facility.

23. McKesson & Robbins and its successors Foremost-McKesson and McKesson Chemical Company (McKesson & Robbins, Foremost-McKesson, and McKesson Chemical Company are collectively referred to herein as the "McKesson Chemical Companies") aggregately owned and operated the Chemical Distribution Facility from approximately 1958 to 1972.

24. As part of the operations of the Chemical Distribution Facility, Merchants and the McKesson Chemical Companies received bulk shipments of various chemicals, including TCE and PCE, along with solvents and other substances containing TCE and PCE or their constituents.

25. TCE, PCE, and their constituents are hazardous substances under Colorado's Voluntary Clean-up and Redevelopment Act, Section 25-16-302, C.R.S., and CERCLA Section 102, 42 U.S.C. § 9602.

26. The bulk chemical deliveries were offloaded, handled, stored, and repackaged for distribution to various regional commercial and industrial operations.

27. Advertisements from the relevant timeframe indicate that Merchants and the McKesson Chemical Companies regularly handled and sold TCE and PCE.  Merchants and the McKesson Chemical Companies also advertised for the sale of other substances containing TCE and PCE, such as carbon tetrachloride, chloroform, chlorothene (a/k/a vinyl chloride monomer or VCM), and styrene monomer.

28. Historical aerial photographs of the Chemical Distribution Facility's operations show a large number of tanks, barrels, totes, and other containers storing bulk and repackaged chemicals in an outdoor storage lot along the east side of the property.  These photos also show loading racks and a large loading dock used for the handling and processing of chemicals.

29. Upon information and belief, TCE and PCE and substances containing TCE and PCE were spilled and released to the environment during the offloading, handling, and repackaging processes.

30. Upon information and belief, TCE, PCE, and substances containing TCE and PCE leaked from the tanks, drums, totes, and other storage containers used by the Chemical Distribution Facility.

31. In or about October 2015, DBC began the investigation of environmental contamination at the Site by engaging a qualified environmental professional to complete a

Phase I Environmental Site Assessment (the "Phase I"). The Phase I identified Merchants' and the McKesson Chemical Companies' operations of the Chemical Distribution Facility on portions of the Site as Recognized Environmental Conditions, or "RECs."

32. Because of the RECs, the Phase I recommended completion of a Phase II Environmental Site Assessment, including an investigation of potential soil and groundwater contamination from the historical uses of the Site.

33. In or about December 2015, DBC began a Phase II Environmental Site Assessment (the "Phase II") by investigating subsurface contamination and indoor air quality of the building currently located at the Site.

34. Soil samples and soil gas samples detected concentrations of TCE, PCE, and other volatile organic compound constituents of TCE and PCE in the soil and soil gas.

35. Groundwater samples collected for the Phase II contained concentrations of TCE, PCE, chloroform, carbon tetrachloride, and the TCE/PCE constituents cis-1,2-DCE, 1,2 dichloroethane, and 1,1-DCE above their respective regulatory Groundwater Protection Values ("GPVs").

36. The detected maximum groundwater concentrations of TCE and PCE were 2,080 micrograms per liter of water ("µg/l") and 7,740 µg/l, respectively. Colorado's GPVs for TCE and PCE are 5 µg/l.

37. Indoor air sampling conducted within the building at the Site yielded TCE at concentrations above the Colorado Department of Public Health and Environment's ("CDPHE's") remediation goals for residential and commercial uses.

38. Based on these sampling results, the Phase II concluded releases of TCE, PCE, and substances containing TCE and PCE occurred on-site during its use as a Chemical Distribution Facility.

39. In conjunction with the initial subsurface and indoor air quality investigation, representatives of DBC and Jason Street contacted CDPHE to discuss the detected contamination.

40. CDPHE requested and reviewed the initial subsurface sampling data. Based on its review, CDPHE determined the Site was a candidate for Colorado's Voluntary Cleanup Program ("VCUP").

41. The VCUP was established by the Voluntary Cleanup and Redevelopment Act, Section 25-16-301, C.R.S. et seq. Pursuant to a Memorandum of Agreement between CDPHE and the United States Environmental Protection Agency ("EPA"), the VCUP sets out the framework for the review and approval of voluntary private response actions contemplated by CERCLA.

42. Once an application to clean up a site under the VCUP has been submitted to CDPHE, EPA will not plan and does not anticipate undertaking any federal action under CERCLA at such a site, unless: (1) the site is a National Priority List caliber site or the site poses an imminent and substantial endangerment to public health, welfare or the environment and exceptional circumstances warrant EPA action; (2) CDPHE's approval of the cleanup plan

becomes void; or (3) the applicant fails to complete or materially comply with the cleanup plan as approved by CDPHE.

43. Pursuant to Section 25-16-307, C.R.S., upon the completion of a response in compliance with a CDPHE approved cleanup plan, the property owner may apply to CDPHE for a No Further Action Determination. CDPHE shall issue a No Further Action Determination when the assessment of site conditions indicates the existence of contamination which does not exceed applicable promulgated state standards (i.e., the response has achieved compliance with applicable state standards) or contamination which does not pose an unacceptable risk to human health and the environment based on the existing and proposed uses of the property.

44. A No Further Action Determination from CDPHE provides that no further corrective action is required with respect to the release of hazardous substances addressed via the approved VCUP response so long as available information indicates environmental contamination does not exceed applicable standards and does not pose an unacceptable risk to human health and the environment. As such, the issuance of a No Further Action Determination does not resolve all potential environmental liabilities with CDPHE and EPA. For example, CDPHE and EPA may take additional action upon obtaining information indicating that site conditions pose an unacceptable risk to human health and the environment. CDPHE and EPA may also take further action if proposed uses for the site are changed. Additionally, CDPHE and EPA may take additional action if the applicable state standards are modified, and the site does not meet the modified standards.

45. Before the Site could enter the VCUP, CDPHE determined that additional site characterization was necessary to develop an appropriate response. CDPHE's primary concern was whether the contamination had migrated off the Site and impacted surrounding properties.

46. At CDPHE's direction, Plaintiffs performed an investigation of the off-site impacts of the detected contamination (the "Off-Site Investigation").

47. Groundwater samples collected for the Off-Site Investigation contained concentrations of TCE, PCE, and TCE/PCE constituents 1,1-dichloroethene, carbon tetrachloride, chloroform, cis-1,2-dischoroethene, and trans-1,2,-dischloroethene above their respective GPVs.

48. The maximum concentrations of TCE and PCE in groundwater detected during the Off-Site Investigation were 2,450 µg/l and 9,050 µg/l, respectively.

49. Soil vapor sampling conducted during the Off-Site Investigation yielded soil vapor concentrations of TCE and PCE in concentrations above CDPHE's Draft Indoor Air Quality Guidance standards.

50. The maximum concentrations of TCE and PCE detected in soil vapor during the Off-Site Investigation were two orders of magnitude higher than CDPHE's Draft Indoor Air Guidance standards.

51. These results indicated that the releases of TCE, PCE, and their constituents associated with the Chemical Distribution Facility's operations had migrated off-site.

52. As an additional part of the VCUP process, in coordination with CDPHE, Jason Street funded and conducted a community outreach program in order to fulfill the public

participation requirements of the National Oil and Hazardous Substances Pollution Contingency Plan (the "NCP"), 40 C.F.R. § 300.700(c)(6).

53. The purposes of the community outreach program were twofold. First, Jason Street provided the community with information regarding the investigation and detection of TCE, PCE, and TCE/PCE constituent contamination. Second, Jason Street sought input from the community regarding the options for the removal of the contamination and entering the Site into the VCUP.

54. The community outreach effort included canvassing the residences and businesses adjacent to and surrounding the Site. Through this process, Jason Street engaged the local community and received public comments and questions regarding the environmental contamination, entering the Site into the VCUP, and response options.

55. Jason Street's representative attempted direct personal contact with the residences and business surrounding the Site. Approximately 70% of these residents and businesses spoke face-to-face with Jason Street's representative. They were provided a flyer with information regarding the Site and VCUP plans and given a contact number for additional follow-up purposes. For the remaining residents and businesses who did not answer during the door-to-door canvassing, the flyer and contact information were left at the properties.

56. The flyer and contact information were also posted in a large public housing project near the Site and a nearby Denver Parks and Recreation facility open to the public.

57. After completing the environmental investigation of on-site and off-site TCE and PCE contamination in coordination with CDPHE, and conducting the community outreach program, representatives of Plaintiffs began the process of developing a response that was protective of human health and the environment.

58. Per Section 25-16-305, C.R.S. and the Memorandum of Agreement between CDPHE and EPA, CDPHE closely coordinated with Plaintiffs to complete the response development and selection process.

59. In or about November 2016, after acquiring the Site, Jason Street submitted its VCUP application to CDPHE (the "VCUP Application"). The VCUP Application proposed a trap-and-treat response based on the conclusions reached through the investigation completed by Plaintiffs' environmental consultants in coordination with CDPHE.

60. The VCUP Application identifies occupant and worker inhalation as the primary pathway for exposure to the detected contamination. The risk to human health associated with inhalation extended to workers and occupants at the Site and residential, commercial, and industrial properties hydrologically downgradient of the former Chemical Distribution Facility.

61. To mitigate risks to human health and the environment, the VCUP Application proposed trap-and-treat bioremediation through underground injections of BOS100, a specialized catalyst designed to rapidly degrade chlorinated solvent contamination like that detected by Plaintiffs' environmental investigation. The BOS100 was to be injected along the boundary of the Site, between the source of the contamination and downgradient properties, where it would best interact with and reduce concentrations of the contamination.

62. The injections of BOS100 were designed to reduce existing contamination both on-site and downgradient of the permeable reactive barrier established by the injections. This, in turn, would reduce the risk associated with the identified inhalation exposure pathway both up- and down-gradient of the injection points.

63. CDPHE approved the VCUP Application on January 23, 2017. After its review of the Site data, consultations with Plaintiffs' environmental consultants, and review of the VCUP Application, CDPHE determined the proposed in-situ response would attain a degree of cleanup and control hazardous substances such that the contamination at the Site would not present an unacceptable risk to human health and environment.

64. Work on the injection of the permeable BOS100 barrier began in February of 2017. The injections of BOS100 were performed in November and December of 2017.

65. To assess the efficacy of the response, groundwater monitoring wells were established immediately up- and down-gradient of the permeable BOS100 barrier.

66. Following the injection of the permeable barrier, quarterly groundwater monitoring has been conducted via these groundwater monitoring wells.

67. Quarterly monitoring indicates the response is working as intended.

68. As of the time of filing this Complaint, quarterly monitoring is ongoing.

69. Due to the levels of contamination present at the Site, Plaintiffs' environmental consultants anticipate additional response actions will be necessary.

70. Plaintiffs have incurred and will continue to incur cleanup and response costs in connection with their investigation and response activities at the Site.

71. Plaintiffs have incurred and continue to incur attorney fees in relation to investigating the environmental contamination at the Site, and designing, negotiating, preparing, and carrying out their response to the contamination.

72. Plaintiffs have also incurred damages in relation to the presence and migration of hazardous substances at the Site.

73. Jason Street and McKesson entered into a tolling agreement (the "Tolling Agreement") regarding Jason Street's claims associated with its response costs. Pursuant to the Tolling Agreement, the one-year period beginning on July 17, 2019, and ending on July 17, 2020, shall not be included in calculating the running of any statute of limitations or other time-based defenses with respect to any and all claims or causes of action relating to or arising out of the response activities taken in connection with the Site.

**FIRST CLAIM FOR RELIEF**
**(Cost Recovery Pursuant to CERCLA § 107)**

74. The above paragraphs are incorporated by reference as though fully stated herein.

75. Plaintiffs and McKesson are persons within the meaning of CERCLA Section 101(21), 42 U.S.C. § 9601(21).

76. The Site and Chemical Distribution Facility are facilities within the meaning of CERCLA Section 101(9), 42 U.S.C. § 9601(9).

77. Hazardous substances within the meaning of CERCLA Section 101(14), 42 U.S.C. § 9601(14), including TCE, PCE, and certain TCE and PCE constituents were released

into the environment by Merchants and the McKesson Chemical Companies on the portions of the Site that were operated as the Chemical Distribution Facility.

78. These releases of hazardous substances from the Chemical Distribution Facility have contaminated the surface and subsurface soils and groundwater at the Site and certain properties located hydrologically downgradient of the former Chemical Distribution Facility.

79. Merchants and the McKesson Chemical Companies were owners and operators of the Chemical Distribution Facility within the meaning of CERCLA Section 101(20)(A), 42 U.S.C. § 9601(20)(A), at the time of the releases of hazardous substances from the Chemical Distribution Facility's operations.

80. Such releases and disposal of hazardous substances by Merchants and the McKesson Chemical Companies constitute releases or threatened releases of hazardous substances within the meaning of CERCLA Section 101(22), 42 U.S.C. § 9601(22).

81. Accordingly, Merchants and the McKesson Chemical Companies are liable under CERCLA Section 107(a)(2), 42 U.S.C. § 9607(a)(2), as persons who at the time of disposal of hazardous substances owned and operated a facility at which such hazardous substances were disposed of.

82. Plaintiffs have incurred and will continue to incur response costs from releases and threatened releases of hazardous substances from the Chemical Distribution Facility's operations.

83. Plaintiffs have incurred and will continue to incur attorney fees in relation to investigating environmental contamination at the Site, and designing, negotiating, preparing and carrying out their response to the contamination.

84. The costs incurred by Plaintiffs in investigating, assessing, evaluating, and responding to the releases or threatened releases of hazardous substances are necessary costs of response within the meaning of CERCLA Sections 101(25) and 107(a), 42 U.S.C. §§ 9601(25) and 9607(a).

85. The response costs incurred by Plaintiffs are consistent with the National Contingency Plan, 40 C.F.R. Part 300.

86. McKesson is the legal successor to Merchants and the McKesson Chemical Companies.

87. Pursuant to CERCLA Section 107(a)(2), 42 U.S.C. § 9607(a)(2), McKesson is liable for the necessary response costs, including attorney fees, incurred by Plaintiffs in relation to environmental contamination at the Site, as well as for additional response costs incurred by Plaintiffs in the future.

88. McKesson is liable to Plaintiffs for interest on such costs of response at the rate specified for interest on investments of the Hazardous Substance Superfund pursuant to CERCLA Section 107(a), 42 U.S.C. § 9607(a).

## SECOND CLAIM FOR RELIEF
### (Contribution Pursuant to CERCLA § 113)

89. The above paragraphs are incorporated by reference as though fully stated herein.

90. As alleged in the First Claim for Relief, which is incorporated herein by reference, McKesson is liable to Plaintiffs under CERCLA Section 107(a)(2), 42 U.S.C. 9607(a)(2).

91. Accordingly, pursuant to CERCLA Section 113(f)(1), 42 U.S.C. § 9613(f)(1), McKesson is liable for contribution to Plaintiffs for the response costs, including attorney fees,

that they have incurred or will incur in relation to the release or threatened release of hazardous substances at the Site.

### THIRD CLAIM FOR RELIEF
### (Declaratory Judgment)

92. The above paragraphs are incorporated by reference as though fully stated herein.

93. There is an actual controversy between Plaintiffs and McKesson concerning McKesson's liability for the investigation of, and response to, environmental contamination at and around the Site.

94. Pursuant to CERCLA Section 113(g)(2), 42 U.S.C. § 9613(g)(2), and 28 U.S.C. § 2201, Plaintiffs are entitled to a declaratory judgment as to the rights and duties of the parties and, in particular, a determination that McKesson is liable for the costs of response incurred and that will be incurred by Plaintiffs with respect to the investigation, assessment, evaluation, mitigation, removal, and remediation of environmental contamination at the Site.

### FOURTH CLAIM FOR RELIEF
### (Trespass)

95. The above paragraphs are incorporated by reference as though fully stated herein.

96. Hazardous substances were released at the Site during the operations of the Chemical Distribution Facility.

97. The presence and migration of the hazardous substances released from the Chemical Distribution Facility are ongoing at the Site.

98. The presence and migration of the hazardous substances released from the Chemical Distribution Facility interfere with Plaintiffs' use and enjoyment of the Site.

99. Plaintiffs have incurred damages and costs in an amount to be proven at trial due to the ongoing presence and migration of hazardous substances at the Site.

100. McKesson is the legal successor to the owners and operators of the Chemical Distribution Facility who caused the release of hazardous substances.

101. Accordingly, McKesson is liable to Plaintiffs for the damages and costs incurred, plus interest and costs, in an amount to be proven at trial, in relation to the presence and migration of hazardous substances at the Site.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in its favor and against McKesson:

A. Declaring McKesson liable for past and future response costs incurred in relation to the former Chemical Distribution Facility's operations;

B. Awarding Plaintiffs cost recovery pursuant to CERCLA Section 107(a), 42 U.S.C. § 9607(a);

C. Awarding Plaintiffs contribution pursuant to CERCLA Section 113(f)(1), 42 U.S.C. § 9613(f)(1);

D. Awarding Plaintiffs compensatory damages and costs in relation to its Fourth Claim for Relief, Trespass;

E. Awarding pre- and post-judgment interest;

F. Awarding attorneys' fees and costs; and

G. Granting such further and additional relief that the Court deems necessary and proper.

Respectfully submitted this 21st day of August, 2020.

                                              s/ Timothy R. Gablehouse
                                              ***Timothy R. Gablehouse, #7231***
                                              ***Melanie J. Granberg, #31354***
                                              ***Evan C. Singleton, #48223***
                                              Gablehouse Granberg, LLC
                                              410 17th Street, Suite 275
                                              Denver, CO 80202
                                              Telephone: (303) 572-0050
                                              tgablehouse@gcgllc.com
                                              mgranberg@gcgllc.com
                                              esingleton@gcgllc.com
                                              Attorneys for Plaintiffs